# COURT OF APPEALS
# DECISION
# DATED AND FILED

## January 13, 2022

**Sheila T. Reiff**
**Clerk of Court of Appeals**

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1185-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2020CT49**

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

    PLAINTIFF-APPELLANT,

 V.

RORY DAVID REVELS,

    RESPONDENT-RESPONDENT.

---

APPEAL from an order of the circuit court for Sauk County: PATRICIA A. BARRETT, Judge. *Reversed and cause remanded for further proceedings.*

¶1 FITZPATRICK, J.[1] Rory Revels was charged in the Sauk County Circuit Court with operating a motor vehicle while under the influence of an

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(f) (2019-20) because the charges in this matter are misdemeanors. All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

intoxicant, third offense, pursuant to WIS. STAT. § 346.63(1)(a), and with operating a motor vehicle with a prohibited alcohol concentration, third offense, pursuant to WIS. STAT. § 346.63(1)(b). Those charges were based on: Revels exhibiting numerous signs of alcohol intoxication before his arrest; and the result of a test of blood drawn from Revels shortly after his arrest which showed that he had a blood alcohol concentration of .176 g/100 mL, more than twice the legal limit. *See* WIS. STAT. § 340.01(46m)(a). At Revels' request, and after an evidentiary hearing, the circuit court dismissed both charges against Revels. The State appeals[2] and argues that the circuit court erred in dismissing the charges. For the reasons discussed below, I agree with the State, reverse the order of the circuit court, and remand this matter for further proceedings consistent with this opinion.

## BACKGROUND

¶2 The following facts are established by the testimony and exhibits introduced into evidence at the evidentiary hearing (including the written reports of two police officers).

¶3 On November 4, 2019, at about 12:30 in the morning, Officer Meyer of the Baraboo Police Department was in his parked squad car just east of Broadway Street in Baraboo. Meyer saw a black truck stopped in the road at the intersection of 8th Avenue and Broadway Street. According to both his written report and testimony, Meyer watched the black truck "stay stationary for a period of 30-45 seconds without moving," although the green traffic control light for the

---

[2] The State's appeal is taken pursuant to WIS. STAT. § 974.05(1)(a).

lane the truck was in signaled for the truck to proceed. He then drove his squad car behind the truck and activated the squad car's emergency lights. Before stepping out of the squad car, Meyer told dispatch that he was checking on a possible disabled vehicle because the truck was not moving.

¶4 Meyer next talked to the driver, who was identified by his driver's license as Rory Revels. Meyer asked Revels whether he was "okay," and Revels responded by stating "[y]es" and explained that he was going home to Hillsboro. Meyer's report contains further material information regarding his interaction with Revels:

> By this time, I smelled a strong odor of intoxicants emitting from Rory's vehicle. Rory also presented with glassy, watery and bloodshot eyes. Rory also presented with slurred speech, slowed response time to my questions and slowed movements. From my training and experience, I know these to be possible clues of alcohol intoxication.
>
> … I asked Rory where he was coming from and he stated he was coming from the Wisconsin Dells area. I asked Rory to tell me how he got to Baraboo. Rory was unable to explain to me how he got to Baraboo or where he came from in terms of his location for consuming alcoholic beverage[]s.

¶5 According to the report of Officer Smith of the Baraboo Police Department, Smith was "called to assist" Meyer at approximately 12:30 a.m. When Smith arrived, he was asked to take over this investigation because Meyer was near the end of his shift and because Meyer was losing his voice. More specifically, Meyer testified that he felt "fine" but was "struggling to speak." Meyer explained that an OWI investigation of Revels would require Meyer to ask Revels to attempt to take certain actions during field sobriety testing, and Revels would "need to understand me clearly … [and] I wouldn't have been able to do so." Meyer made Smith aware of Meyer's observations concerning Revels to this

point, and Smith made contact with Revels while Revels was still seated in his truck.

¶6      Smith's report contains the following pertinent observations from the time he arrived at the scene and the information told to him by Meyer:

> When I arrived, I observed a black Ford pickup truck running with a male in the driver seat smoking a cigarette. Officer Meyer's patrol vehicle was behind the Ford pickup with its emergency lights activated. Officer Meyer informed me that he had been stationary in the Community Bank parking lot observing traffic when he observed the subject's vehicle stop at the red light at 8th Avenue and South Broadway Street. Officer Meyer stated that once the light turned green, the subject vehicle did not move. Officer Meyer said he watched for about a minute and the vehicle never moved, even though the light was green. Officer Meyer left the bank parking lot and positioned his fully marked patrol vehicle behind the subject vehicle and then he activated his emergency lights. Officer Meyer believed that the subject was having mechanical issues. Officer Meyer told me that he made initial contact with the driver, who identified himself with a Wisconsin driver's license as Rory Revels. Officer Meyer told me that Rory told him he had consumed three beers. Officer Meyer told me that Rory had bloodshot, watery, and glassy eyes, his speech was slurred, and Officer Meyer smelled a strong odor of an intoxicating beverage emitting from the vehicle. Officer Meyer was about to go off shift due to an illness and I assumed the case at this point.

¶7      Smith's report describes his initial interaction with Revels:

> I made contact with Rory while he was in his vehicle still sitting at the traffic light. When I approached the vehicle I smelled a strong odor of an intoxicating beverage emitting from the vehicle. I shined my flashlight and could I see that Rory presented with glassy/watery and bloodshot eyes. From my training and experience as a law enforcement officer, I am aware these can be signs of impairment caused by alcohol. I asked Rory if he had been drinking, and he replied that he had five beers. I asked Rory if he felt like he was okay to drive, and he replied that he was good to drive. I asked Rory if he would be willing to do some field sobriety tests, and he replied "carry on". I

4

asked Rory if that meant he would do the tests, and he replied that he would do the tests. I had Rory exit his vehicle and I directed him across the street to the covered awning area of the bank. When Rory exited his vehicle I asked him if he consented to a search of his person. Rory told me to "carry on", and I searched him, which did not turn up anything of evidentiary value or law enforcement concern.

¶8    Smith's report describes in detail his field sobriety testing of Revels, and I summarize that information now. On the Horizontal Gaze Nystagmus Test, Smith observed six out of six possible clues for intoxication. Regarding the "walk and turn" test, Smith observed that Revels exhibited six out of eight possible clues of intoxication. For the "one leg stand" test, Smith observed three out of four possible clues of intoxication. Revels was then given a preliminary breath test and the reading was .163 BrAC.

¶9    When the field sobriety testing concluded, Smith arrested Revels. After the arrest, Revels refused to consent to a blood draw. Smith transported Revels to the Baraboo Police Department station, and a paramedic drew blood from Revels after a search warrant was granted. The blood sample was sent to the Wisconsin State Laboratory of Hygiene and tested for the presence of ethanol. The result of the blood testing was 0.172 g/100 mL.

¶10    The further actions of the officers and the videos of these just-described events will be discussed in more detail later in this opinion. For now, a few material points are touched upon. The Meyer squad car camera video and the Meyer body-worn camera video of this incident were uploaded to the Baraboo Police Department server when Meyer returned to the station. Meyer did not preserve his squad car and body-worn camera videos of this incident to permanent media after returning to the station as his shift ended. Rather, Meyer expected Smith to complete that task. The Chief of the Baraboo Police Department, Mark

Schauf, testified that Meyer's expectation about Smith preserving the two Meyer videos to permanent media was consistent with the Baraboo Police Department's "practice … generally" that the "lead officer for the case will download all [videos of each officer involved in the investigation] onto one storage device."

¶11   Smith attempted to download the two Meyer videos consistent with Meyer's expectation and the general practice described by Chief Schauf.  Smith testified that, while in the patrol room at the station at the end of his shift, he believed that he saved the videos from Meyer's squad car and Meyer's body-worn camera, as well as his own body-worn camera video, related to Revels to a permanent storage device.  Smith testified from his "independent recollection" on this subject.  Smith stated that he reviewed each video when he saved those onto the desktop of his computer in the patrol room.  But, instead of preserving each of those three videos, Smith accidentally saved three copies of his body-worn camera video to the permanent storage media.  Chief Schauf explained at the hearing that, at some point more than 120 days after videos are uploaded to the Baraboo Police Department server, the videos are automatically overwritten through the standard operation of the server, and that is what happened to the two Meyer videos.  Smith testified that he made a "mistake" causing Meyer's squad car camera and body-worn camera videos not to be preserved.

¶12   Revels was charged with operating a motor vehicle under the influence of an intoxicant, third offense, and operating a motor vehicle with a prohibited alcohol concentration, third offense. Revels filed a motion in the circuit court requesting that the charges be dismissed because Meyer's squad car camera and body-worn camera videos were not preserved by the Baraboo Police Department.   The circuit court granted Revels' motion and dismissed both charges.  The State appeals.

6

¶13    Other material facts will be mentioned in the following discussion.

## DISCUSSION

¶14    Revels argues that his due process rights were violated because the videos were not preserved.[3]  I next summarize the standard of review and general principles regarding preservation of evidence in this context.

### A.  Standard of Review.

¶15    Whether action by the State constitutes a violation of due process is a question of law that is decided on appeal independent of the determination of the circuit court.  *State v. Luedtke*, 2015 WI 42, ¶37, 362 Wis. 2d 1, 863 N.W.2d 592.  A circuit court's findings of historical fact will be upheld unless those findings are clearly erroneous.  *Id.*   A circuit court's findings of fact are clearly erroneous when those findings "are unsupported by the record."  *Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶11, 290 Wis. 2d 264, 714 N.W.2d 530.  Whether facts satisfy a particular legal standard is a question of law.  *Langlade Cnty. v. D.J.W.*, 2020 WI 41, ¶47, 391 Wis. 2d 231, 942 N.W.2d 277.

### B.  General Principles.

¶16    In order to prevail on his argument, Revels must prove that the evidence that was not preserved was either "potentially exculpatory" or "apparently exculpatory."  *Luedtke*, 362 Wis. 2d 1, ¶39.  Revels must further show that the State "(1) failed to preserve evidence that was apparently exculpatory or

---

[3] Revels made a request for the videos discussed in this opinion, but Revels does not argue that the State's actions violated his statutory right to discovery pursuant to WIS. STAT. § 971.23.

(2) acted in bad faith by failing to preserve evidence that was potentially exculpatory." *Id.* (citing *State v. Greenwold*, 189 Wis. 2d 59, 67, 525 N.W.2d 294 (Ct. App. 1994)); *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988).[4] "Absent bad faith, destruction of evidence that merely has *potential* exculpatory value does not violate due process." *Luedtke*, 362 Wis. 2d 1, ¶57 (citing *Greenwold*, 189 Wis. 2d at 67); *Youngblood*, 488 U.S. at 58.

¶17    In this context, acting in "bad faith" means that the officers "acted with official animus or made a conscious effort to suppress exculpatory evidence." *Luedtke*, 362 Wis. 2d 1, ¶55 (quoting *Greenwold*, 189 Wis. 2d at 69). As part of the bad faith analysis, Revels must also prove that the officers had knowledge of the potentially exculpatory nature of the evidence before it was destroyed. *Youngblood*, 488 U.S. at 56 n.*; *Greenwold*, 189 Wis. 2d at 69.

¶18    In order to establish that the State violated his due process rights by destroying apparently exculpatory evidence, Revels must further demonstrate that the lost evidence is "of such a nature that the defendant [is] unable to obtain comparable evidence by other reasonably available means." *State v. Munford*,

---

[4] In *Arizona v. Youngblood*, 488 U.S. 51 (1988), which our supreme court states "controls" in these circumstances, *State v. Luedtke*, 2015 WI 42, ¶39, 362 Wis. 2d 1, 863 N.W.2d 592, the U.S. Supreme Court held that these standards "stem[] from our unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause … as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable and evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 57-58.

2010 WI App 168, ¶21, 330 Wis. 2d 575, 794 N.W.2d 264; *see also* **Greenwold**, 189 Wis. 2d at 67.[5]

### C. Meyer's Squad Car Camera Video.[6]

¶19     The circuit court analyzed whether Revels had shown that the Meyer squad car camera video was potentially exculpatory and concluded that it was ("I think the [Meyer squad car camera] recording fits under the potentially

---

[5] In briefing in this court, Revels relies on three Wisconsin appellate opinions which concern spoliation of evidence in civil cases. My analysis does not rely on those opinions because those are not applicable in this criminal case. The analysis regarding spoliation of evidence in a civil case is not based on constitutional due process rights. *See* **Estate of Neumann ex rel. Rodli v. Neumann**, 2001 WI App 61, ¶81, 242 Wis. 2d 205, 626 N.W.2d 821; **Dimond v. Henderson**, 47 Wis. 172, 2 N.W. 73 (1879); **Knapp v. Edwards**, 57 Wis. 191, 15 N.W. 140 (1883).

[6] In briefing in this court, Revels asserts that the circuit court determined that a squad car camera video from Smith's vehicle concerning this incident was potentially exculpatory. That is not correct. The circuit court's decision mentions only two videos, the Meyer squad car camera video and the Meyer body-worn camera video. Revels does not argue that this was an error of the circuit court. The briefing of the parties in this court considers only the Meyer squad car camera and Meyer body-worn camera videos in any detail. References in Revels' briefing in this court about any Smith squad car camera video are in very general terms, and Revels does not attempt to describe whether Smith's squad car camera would have recorded anything at all, much less anything that was potentially exculpatory. The testimony of Smith made only a quick mention of this, and he stated that his squad car camera video was "overridden" at the scene and his squad car camera was not facing in a direction where any relevant events occurred. Therefore, Revels has failed to prove that anything that could have been recorded by Smith's squad car camera was potentially exculpatory, and this will not be mentioned further.

exculpatory category.").[7]  I start the discussion of whether the Meyer squad car camera video was potentially exculpatory by taking up a preliminary point.[8]

¶20    The parties do not mention in their briefing a matter germane to this appeal:  Does "exculpatory," as the term is used in this appeal, concern only evidence that makes it less likely that Revels is guilty of each element of the crimes charged, or does the definition of "exculpatory" in this context also include evidence that makes it more likely that Revels will succeed on a motion to suppress based on a lack of reasonable suspicion for Meyer's contact with Revels?[9]  I will assume that the more expansive latter definition applies.  *See State v. Weissinger*, 2014 WI App 73, ¶11, 355 Wis. 2d 546, 851 N.W.2d 780 (Ct. App. 2014) (discussing "outcome-determinative evidence").

¶21    The current question, therefore, is whether the Meyer squad car camera video was potentially exculpatory in that Revels has shown that the video would have factually bolstered an argument that there was no reasonable suspicion for Meyer to interact with him when Revels' truck sat for thirty to forty-five

---

[7] Revels argues that the Meyer squad car camera video was potentially exculpatory; Revels does not argue in this court that the Meyer squad car camera video was apparently exculpatory.  In the circuit court, in response to an inquiry from the court, the prosecutor said that the Meyer squad car camera video was potentially exculpatory.  In this court, the State argues that the Meyer squad car camera video was "at most" potentially exculpatory.

[8] This issue also makes a difference to a question that will be analyzed within the bad faith analysis in the next section of this opinion; namely, whether Revels has shown that the officers had knowledge of the exculpatory nature of the videos before those were not preserved. *State v. Greenwold*, 189 Wis. 2d 59, 69, 525 N.W.2d 294 (Ct. App. 1994).

[9] In briefing in this court, the only assertion by Revels that the two Meyer videos could be exculpatory concerns whether Meyer had reasonable suspicion for the stop.  As one example in Revels' briefing in this court, he states:  "If the recordings showed that Meyer lacked reasonable suspicion, then the stop was unlawful and all evidence derived from the unlawful stop would have to be suppressed."

seconds at a green light at 12:30 a.m. *State v. Washington*, 2005 WI App 123, ¶16, 284 Wis. 2d 456, 700 N.W.2d 305 ("When determining if the standard of reasonable suspicion was met, those facts known to the officer at the time of the stop must be taken together with any rational inferences, and considered under the totality of the circumstances.… [T]o justify an investigatory stop, '[t]he police must have a reasonable suspicion, grounded in specific articulable facts and reasonable inferences from those facts, that an individual is [or was] violating the law.'").

¶22    Chief Schauf testified that the squad car camera in each car is always recording. However, as relevant here, the system in the car begins saving that recording once the officer activates the squad car's emergency lights. Additionally, when the system is activated, the system saves thirty seconds of the recording prior to activation. Meyer testified that, while his squad car video might have captured Revels' vehicle parked at the traffic light, it might not have ("[I]t depends [on] the angle of what my squad, or my patrol vehicle[,] was pointed."). Meyer further testified that, from the moment he saw Revels' truck stopped at the green light until the moment he parked behind that truck and activated his squad car video, between fifteen and thirty seconds would have elapsed. Accordingly, Meyer's squad car camera would have recorded either nothing except the squad car in motion or what was seen by the camera about fifteen seconds before his squad car was in motion.

¶23    The circuit court stated the following in its decision about what the Meyer squad car camera video would have exhibited: "[T]he testimony is unclear at best of what it would show, when it would have shown, how much it would have shown, and what importance that would have played. Nobody's quite clear on that subject, but the Court's concern [] is that [] nobody seemed to know

exactly when it would have started showing anything." "[W]hat exactly and the timing of what exactly was seen that Officer Meyer believes prompted his action may or may not have been shown by the [Meyer squad car camera] recording, and it's that ambiguity that helps none of us." Those statements of the circuit court lead only to the conclusion that Revels has not met his burden to show that the Meyer squad car camera video was potentially exculpatory. *See Luedtke*, 362 Wis. 2d 1, ¶39.

¶24 The circuit court also took up the question of whether Meyer had reasonable suspicion for the stop. It stated the following regarding Meyer's contact with Revels:

> As far as the reason for the officer to make contact with Mr. Revels' vehicle, certainly law enforcement frequently makes contact with vehicles who would appear to be stopped in a lane of traffic, if nothing more than for safety concerns, not only for the vehicle that's stopped in a lane of traffic with a green light in this case, but also for other vehicles that might come down the road and not immediately realize that the vehicle wasn't moving, that the light was green but it wasn't moving.
>
> *So I don't fault Officer Meyer for making that initial contact. I think it was appropriate under all of the circumstances.*

(Emphasis added.) Those statements of the circuit court also lead only to the conclusions that there was reasonable suspicion for Meyer to make contact with Revels and that Meyer's squad car camera video did not contain potentially exculpatory evidence.

¶25 The circuit court erred in concluding that the standard that the Meyer squad car camera was potentially exculpatory had been met. *D.J.W.*, 391 Wis. 2d 231, ¶47. Experience confirms that not every piece of evidence that is not preserved will be at least potentially exculpatory. For the reasons mentioned, the

record does not show that the Meyer squad car camera video was potentially exculpatory.

¶26 Revels argues on appeal that the Meyer squad car camera video was potentially exculpatory, but those arguments fail. First, he contends that "[a]ny evidence showing what Meyer observed in the time before he activated his emergency lights, and what he observed as he approached Revels, as well as during his initial contact with Revels is critical to the assessment of this issue." Revels' argument is beside the point. Simply because evidence is part of the "assessment" of an issue by defense counsel does not make the evidence exculpatory. And Revels gives no evidentiary basis for a contention that the Meyer squad camera video contained any potentially exculpatory evidence. Specifically, Revels points to no evidence in the record to rebut Meyer's undisputed written report and testimony (that is confirmed by Smith's written report as to what Meyer reported at the time) that Revels was stopped at a green light for thirty to forty-five seconds in the middle of the night. The facts known to Meyer constituted reasonable suspicion for the stop of Revels' truck. Second, Revels asserts that maybe the Meyer squad car camera video might have shown Revels' truck driving past the spot Meyer was parked. But, as discussed, Revels did not meet his burden to prove what would have been shown by the Meyer squad car camera video.

¶27 In sum, Revels has not met his burden to show that the Meyer squad car camera video contained potentially exculpatory evidence.[10]

### D. The Officers Did Not Act in Bad Faith.

¶28 I now consider whether Revels proved, through evidence adduced at the hearing, that the Meyer squad car camera video and the Meyer body-worn camera video were not preserved by the officers in "bad faith."[11] *Greenwold*, 189 Wis. 2d at 70.

¶29 As already noted, acting in "bad faith" means that the officers "acted with official animus or made a conscious effort to suppress exculpatory evidence." *Luedtke*, 362 Wis. 2d 1, ¶55 (quoting *Greenwold*, 189 Wis. 2d at 69). This court has given a more particularized definition of "bad faith" in this context:

> After articulating the due process standard, the *Youngblood* Court failed to define or illustrate bad faith in the context of the State's failure to preserve potentially exculpatory evidence. The Court did, however, indicate what bad faith is not. *Id.* at 58, 109 S. Ct. at 337. It is apparent from its analysis that there is no bad faith when the police negligently fail to preserve evidence which is merely potentially exculpatory. *Id.*

---

[10] Revels also contends that the Meyer squad car camera video bears on the question of reasonable suspicion for the stop because it is the "best evidence." However, that contention is untethered to the case law standards already mentioned and does not consider whether the video was potentially exculpatory in these circumstances.

[11] Whether the Meyer body-worn camera video contains apparently exculpatory evidence will be discussed in the next section of this opinion. That video is mentioned here because, if the Meyer body-worn camera video could be considered to be potentially exculpatory, then whether the officers acted in bad faith as to that video would be material. I discuss whether there was bad faith shown regarding the Meyer squad car camera video, even though the video is not potentially exculpatory, in order to have a more complete analysis of the issues.

> … Also, many federal courts support the proposition that negligence in preserving evidence is not a proper basis for a showing of bad faith.[12]

*Greenwold*, 189 Wis. 2d at 68-69.

¶30 With that framework in mind, the circuit court's decision is considered. The circuit court stated, regarding his body-worn camera video, that Meyer had the opportunity to follow the Baraboo Police Department's written policies for the preservation of the videos.[13] But, Meyer relied on Smith to preserve each of Meyer's two videos. Referring to Meyer, the circuit court concluded that this was a "flagrant violation of the policy." The court came to a somewhat different conclusion regarding Smith:

> Officer Smith, in his efforts to ensure that the evidence was actually properly saved, again labeled some things, downloaded them, but downloaded exactly one thing, his own body cam. And that too would have been in violation of the policies.

¶31 The circuit court did not engage with the standards for determining bad faith as discussed above. Put another way, the circuit court did not conclude that the officers' acts were done with "official animus" or "a conscious effort to suppress exculpatory evidence."

---

[12] This court then collected several federal court opinions which held that negligence, even gross negligence, by law enforcement in failing to preserve evidence does not constitute "bad faith." *See Greenwold*, 189 Wis. 2d at 69.

[13] A written Baraboo Police Department policy states that, at the end of each shift, each officer must "assure" any necessary case video has been uploaded to the central server. Also, as to the body-worn camera, a written Baraboo Police Department policy states that "[o]fficers shall copy the entire recording onto a DVD and enter the DVD into evidence/property of the case."

¶32     Regardless, Revels contends that the officers' acts were done in bad faith.  More particularly, Revels' argument relies on the conclusion of the circuit court that Meyer not preserving his squad car camera video and body-worn camera video to permanent media, and relying on Smith to do so, was a "flagrant violation of the policy."  According to Revels, the "violations" of the policies by Meyer and Smith "manifested bad faith."  Revels' contention fails for at least two reasons I next discuss, either of which is sufficient to reject the argument.

¶33     "Bad faith" in this context is defined by the standards already enunciated in this opinion.  A due process right is not violated solely by an officer not following a written policy, and this is confirmed by federal case law I find persuasive.  In *U.S. v. Deaner*, 1 F.3d 192, 199-200 (3d Cir. 1993), the Third Circuit Court of Appeals applied the standards regarding destruction of evidence set forth in *Youngblood*.  *Deaner*, 1 F.3d at 200.  Deaner argued that the government's destruction of marijuana evidence related to his conviction did not follow written procedures for the destruction of such evidence set forth in the Code of Federal Regulations and, as a result, the government's acts constituted bad faith.  *Id.* at 199.  The court rejected that argument and held:

> While a showing that the government did not follow standard procedure could provide some evidence of bad faith, we have not held that an improper procedure in and of itself implies bad faith.  While it may permit such an inference, it does not syllogistically imply the presence of bad faith as a matter of deductive logic.

*Id.* at 200; *see, e.g.*, *U.S. v. Greenwood*, 246 Fed. Appx. 174, 176 n.2 (4th Cir. 2007).  When law enforcement officers do not satisfy a written policy of their department, that does not inexorably lead to the conclusion that a defendant, such as Revels, has met his burden to establish bad faith on the part of the officers.  As one obvious example, an officer can fail to satisfy a written policy based on

16

mistake or negligence, and such mistaken or negligent acts do not meet the definition of bad faith. *See Greenwold*, 189 Wis. 2d at 68-69. Further, Revels does not explain in any persuasive manner how these officers not satisfying a written policy equates with either "official animus" or "a conscious effort to suppress exculpatory evidence." *See Luedtke*, 362 Wis. 2d 1, ¶55. The *Youngblood*/*Luedtke* framework does not work backwards. In other words, that the Meyer videos were not preserved despite written policies calling for those to be preserved does not mean that the officers acted in bad faith. Accordingly, any violation of the Baraboo Police Department written policies by the officers cannot be the basis to conclude that bad faith has been established by Revels.

¶34 There is a second reason that Revels' argument on bad faith is rejected. Even if one could read into the circuit court's decision that bad faith was implicitly concluded by the court (and one cannot reasonably do so because, among other reasons, the circuit court did not find that the testimony of the officers was not credible), there is insufficient evidence to support Revels' assertion that the officers acted in bad faith in not preserving the videos. As noted, this court reviews de novo a determination of whether there is sufficient evidence that a legal standard, such as bad faith, has been satisfied. *See D.J.W.*, 391 Wis. 2d 231, ¶47. The evidence at the hearing established the following material facts.

¶35 Chief Schauf testified that Meyer's expectation that Smith would save all videos related to the Revels incident was general departmental practice; that is, the lead officer (here, Smith) is responsible for permanently saving case-related videos, and that officer will download multiple videos to permanent media. After leaving the scene where he interacted with Revels, Meyer returned to the station, and his squad car video was uploaded automatically to the Baraboo Police Department's server as described by Chief Schauf. In addition, Meyer's body-

17

worn camera video uploaded to the server when Meyer placed the camera in a USB charging cradle at the station. Accordingly, at that point, the departmental practice described by Chief Schauf was being followed by Meyer. His squad car camera video was on the server because he drove to the station (and it uploaded automatically to the server), and his body-worn camera video was on the server because he intentionally uploaded that video. Both videos were then available for Smith to retrieve and place on a permanent storage device.[14]

¶36 For his part, Smith testified that he took the following steps to preserve Meyer's videos and his own body-worn camera video:

> [Defense Counsel]: You also say that Officer Meyer's body-worn camera recording and his [squad car camera] recording were added to the case file, correct?
>
> [Smith]: Yes, I did.
>
> [Defense Counsel]: So you took responsibility for Officer Meyer's recordings, correct?
>
> [Smith]: Yes, I did.
>
> ….
>
> [Defense Counsel]: As you sit here today do you have an independent recollection of actually storing Officer Meyer's [squad car camera] and Officer Meyer's body camera audio/video footage on a USB or a DVD?
>
> [Smith]: I recall downloading them, reviewing them before I put them on the USB file, and I recall dragging those files onto the USB.
>
> [Defense Counsel]: Where did you do that?

---

[14] It bears noting that the two Meyer videos in question were not destroyed by the officers. Rather, the videos were not preserved. As Chief Schauf testified, after 120 days on a Baraboo Police Department server, the videos are overwritten at some undetermined time in the future. As a result, the videos were written over per standard operating procedure of the server at some point before the videos were searched for at Revels' request.

[Smith]:  In the patrol room.

….

[Defense Counsel]: ...  You say you have an independent recollection of saving these audio/video recordings, is that correct?

[Smith]:  Yes.

[Defense Counsel]: And the way in which you saved or stored them was to put them on a USB drive, correct?

[Smith]:  Initially I usually save them to a desktop because they take a long time to download and then I individually select the folders, drag them on to the USB folder.

¶37    The prosecutor also asked questions of Smith on this topic:

[Prosecutor]:  So some of that was you, I believe, you download them from the server onto a, like a desktop of one of the computers in your squad room?

[Smith]:  That's correct.

[Prosecutor]:  And then once they're there, you then click, drag and drop them onto the USB drive or whatever media you're using?

[Smith]:  Correct.

[Prosecutor]:  Now, did you eventually go back and look at the saved file or the, I guess the evidentiary file for this case to see what was in fact saved?

[Smith]:  I did.

[Prosecutor]:  And what did you – was there a flash drive in that file?

[Smith]:  You're talking about the evidence?

[Prosecutor]:  Yes.

[Smith]:  There was a flash drive.

[Prosecutor]:  And did you plug it in to inspect what was on there?

19

[Smith]: I did.

[Prosecutor]: What, if anything, did you learn about the files on that drive?

[Smith]: I found there were three copies of my body-worn camera saved on the USB drive instead of the other two videos from Officer Meyer's.

[Prosecutor]: So all told in this case, let's say you had done things perfectly and saved Officer Meyer's stuff instead of three copies of your own, how many total videos would there have been?

[Smith]: There would have been three.

[Prosecutor]: And there were in fact three on the disk?

[Smith]: Ultimately there were three on the disk.

[Prosecutor]: Would you say it's fair to say it was an inadvertent mistake by you by dragging and dropping the same file three times?

[Smith]: I would agree it was a mistake.

¶38    The evidence establishes that Revels has not met his burden to show bad faith on the part of the officers. There is insufficient evidence that the officers acted with "official animus" in failing to preserve the two Meyer videos. The fact that the Chief of Police knew of, and condoned, the practice used by Meyer and Smith of the lead officer taking responsibility for downloading videos from each officer to permanent media is strong evidence that the officers did not act with official animus. That conclusion is confirmed because that condoned general practice was indisputably designed and intended to have the two Meyer videos preserved. That practice is another route to preserve the Meyer videos that is slightly varied from the written policies. There was a procedure in place for the two Meyer videos to be preserved, and the only evidence is that both officers intended to follow that procedure to preserve the videos. The testimony supports

only the conclusion that Smith made a mistake in failing to preserve the videos. That is where the procedure failed, and negligence cannot be a basis for a conclusion of bad faith. *Greenwold*, 189 Wis. 2d at 68-69.

¶39     For many of the same reasons, there is insufficient evidence to prove that the officers "made a conscious effort to suppress" the two Meyer videos. There is no reasonable conclusion from this record that Meyer or Smith made a conscious effort to see that these two videos were not preserved. The evidence shows that the officers fully intended to preserve these videos, but Smith's mistake in not preserving the two Meyer videos is the reason those videos do not now exist. *See Youngblood*, 488 U.S. at 58 ("The failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent.… The Arizona Court of Appeals noted in its opinion—and we agree— that there was no suggestion of bad faith on the part of the police."); *Greenwold*, 189 Wis. 2d at 70 ("There is no evidence that the officers acted with animus or made a cognizant effort to suppress potentially exculpatory evidence either. Their inadvertence or carelessness in preserving the evidence does not rise to a level of

animus or a conscious effort to suppress evidence.").[15] For those reasons, Revels' argument regarding bad faith fails.[16]

¶40    In addition, there is a separate portion of the bad faith analysis where Revels' assertions also fall short. Revels must prove that the officers were aware of the exculpatory nature of the evidence at the time the two Meyer videos were not preserved. *Luedtke*, 362 Wis. 2d 1, ¶55 (citing *Greenwold*, 189 Wis. 2d at

---

[15] As part of his bad faith discussion, Revels attempts to argue that the written policies of the Baraboo Police Department "create an expectation" that the videos would be preserved. Revels gives no factual basis to conclude that anyone, including Revels, was aware of the existence of the videos or these polices so as to create an "expectation" before the videos were overwritten. In addition, Revels relies on *State v. Huggett*, 2010 WI App 69, 324 Wis. 2d 786, 783 N.W.2d 675, and this reliance is misplaced for several reasons. First, *Huggett* concerned apparently exculpatory evidence, and the question of bad faith does not arise with failure to preserve apparently exculpatory evidence. *Id.* at ¶16; *Luedtke*, 362 Wis. 2d 1, ¶57. Second, Revels does not explain how the "expectation" argument he tries to draw from *Huggett* fits into the *Youngblood*/*Luedtke* analysis that must be applied in these circumstances. Third, unique facts in *Huggett* make it distinguishable from this case. In *Huggett*, Peach broke into the house of Huggett and Kerbel, and Peach was shot to death by Huggett. *Huggett*, 324 Wis. 2d 786, ¶3. Huggett was later charged with second-degree intentional homicide but, immediately after the incident, Huggett claimed that he acted in self-defense and defense of others. *Id.*, ¶1. Also shortly after Huggett shot Peach, Huggett and Kerbel brought to law enforcement's attention threatening voice mail messages sent to Huggett and Kerbel from Peach. *Id.*, ¶¶4-7. Law enforcement "immediately realized" the evidentiary value and seized Kerbel's phone and Huggett's phone. *Id.*, ¶¶4-5. While in the possession of law enforcement, the State did not preserve the voice mail messages and those were automatically deleted with no chance of recovery. *Id.*, ¶10. In those circumstances, in which the State was immediately aware of the clearly exculpatory evidence, took the phones that belonged the Huggett and Peach, and then allowed the voice mails to be deleted, there may be a place for an "expectation" consideration because the *Huggett* court was discussing "exclusive control" of the evidence. *Id.*, ¶¶16-18. Those unusual facts are not present here.

[16] In a possible reference to bad faith, the circuit court stated near the end of its decision: "And what would have prompted Officer Meyer to hand that off to Officer Smith is unknown, it's untested, and we have no way of actually determining whether that was proper at that point in time." It is difficult to put this remark into context in the *Youngblood*/*Luedtke* analysis because none was given by the circuit court. More importantly, how Officer Meyer losing his voice (which was confirmed by Smith in his testimony) makes any difference to the analysis in this case is not explained by either the circuit court or Revels. As well, the only evidence in the record about the reasons Officer Smith took over the investigation of Revels was because Meyer was losing his voice and Meyer's shift was about to end.

69). Revels fails to meet his burden on this portion of the bad faith analysis for the following reasons. First, as already discussed in the previous section of this opinion, there is no basis to conclude on this record that there was exculpatory evidence on the Meyer squad car camera video. Second, the same is true regarding Meyer's body-worn camera video as will be discussed in the next section of this opinion. Third, as will also be seen in the next section of this opinion, the officers' testimony does not support a conclusion that the officers agreed at the hearing that the two Meyer videos contained exculpatory evidence.

¶41 In sum, Revels fails to prove that Meyer and Smith acted in bad faith in not preserving the Meyer squad car camera video and the Meyer body-worn camera video.

### E. Meyer's Body-Worn Camera Video Was Not Apparently Exculpatory.

¶42 The remaining issue is whether Revels met his burden to show that the Meyer body-worn camera video was apparently exculpatory.[17] *Luedtke*, 362 Wis. 2d 1, ¶39. I start the analysis with statements made by the circuit court on this issue.

¶43 Concerning the Meyer body-worn camera video, the circuit court stated, "and that in and of itself speaks to the fact that it was a particular piece of evidence that has the *ability to be apparently exculpatory, but yet again we have no way of knowing*." (Emphasis added.) That conclusion of the circuit court

---

[17] If Revels has not shown that the Meyer body-worn camera video contained exculpatory evidence, it cannot be a basis for dismissal of the charges. If Revels has not shown that the Meyer body-worn camera video was potentially exculpatory, then it cannot be a basis for dismissal of the charges because, as discussed, the officers did not act in bad faith in failing to preserve this video. *See Luedtke*, 362 Wis. 2d 1, ¶57.

supports the proposition that Revels failed to meet his burden to show that the Meyer body-worn camera video was apparently exculpatory.

¶44    The circuit court also made this statement in its decision regarding the Meyer body-worn camera video: "Again, we don't have a clear recollection by Officer Meyer of when he even turned his body camera on, so we're not even certain whether this was two minutes, five minutes, seven minutes, we have no idea because again the report gives us no indication about any of that."[18]  Revels does not rely on that statement by the circuit court because there is no dispute that Meyer spoke to Revels for a period of time that was not lengthy and, if there were several minutes before Meyer activated his body-worn camera, it necessarily follows that it is much less likely that the Meyer body-worn camera video could have contained apparently exculpatory evidence.

¶45    More importantly, the record does not support the finding of the circuit court that there is a discrepancy of several minutes as to when Meyer initiated his body-worn camera in his personal interaction with Revels.  A circuit court's findings of fact are clearly erroneous when those findings are "unsupported by the record." *Royster-Clark*, 290 Wis. 2d 264, ¶11.  Meyer's testimony shows that he activated the body-worn camera for his personal interaction with Revels. Meyer also testified that "all" of his contact with Revels was being recorded.  The only qualification of Meyer's testimony on this point is that he did not "specifically remember the exact millisecond" when he turned on his body-worn

---

[18] The basis for Revels' motion concerns the failure to preserve the two Meyer videos. There is no assertion that Meyer acted improperly, or violated Revels' due process rights, based on when he turned on his body-worn camera.

camera. In fact, Revels' briefing in this court contradicts the circuit court's finding and states:

> This includes information about [sic] drew Officer Meyer's attention to the truck, and includes his first contact with Revels. This information was recorded on Meyer's body-worn camera; it was created when Meyer turned on the camera as he activated his squad's emergency lights—as the department's policy requires.

For those reasons, the record does not support the circuit court's finding. The record is that Meyer's body-worn camera was recording during Meyer's personal interaction with Revels.

¶46 Regardless, the circuit court determined that the Meyer body-worn camera video was apparently exculpatory. The initial reason given by the circuit court is that its conclusion is "based on the testimony of both officers." That was explained later in its decision when the court stated: "Both officers concurred that in fact they believed that they had at least potential exculpatory information, if not apparent exculpatory information." That reasoning of the circuit court falls short for at least two reasons. First, neither the circuit court nor this court is bound by a witness's view about whether evidence is exculpatory in any sense. Second, and just as importantly, that is not what the officers said at the hearing. Revels' counsel asked Meyer the following questions and received these pertinent answers:

> [Defense Counsel]: You believed, given what you told Officer Smith, that those recordings *were evidence of a possible crime*, correct?
>
> [Meyer]: Correct.
>
> [Defense Counsel]: You understood that that *evidence might play a significant role in this case*, correct?
>
> [Meyer]: It would *assist*, yes.

[Defense Counsel]: You believed and understood that it could be both important to the prosecution and the defense, correct?

....

[Meyer]: Yes, I believe that would *have some value*.

[Defense Counsel]: To both the defense and prosecution, correct?

[Meyer]: Correct.

[Defense Counsel]: You believe that this evidence *could be and might be evaluated by both the defense and prosecution* to test the stop, correct, the legality of the stop, correct?

[Meyer]: Correct.

(Emphasis added.) Revels' counsel asked the following questions and received the following pertinent answers from Smith:

[Defense Counsel]: And you believed that these recordings *contained evidence of what might be a crime*, correct?

[Smith]: Yes.

[Defense Counsel]: And you believed that this *evidence might play a significant role in this case*, correct?

[Smith]: Correct.

[Defense Counsel]: You believed that it *could be significant to both the prosecution and the defense*, correct?

[Smith]: Yes.

[Defense Counsel]: You believed that the *evidence would be subject to evaluations by the prosecution and the defense*, correct?

[Smith]: Of course.

(Emphasis added.)

¶47    The questions asked by Revels' counsel were not material to the issue of whether these videos contained apparently exculpatory evidence. In these circumstances, evidence is exculpatory if its use makes it more likely that the defense will succeed in challenging the State's proof regarding the elements of the crime charged or in asserting that there was no reasonable suspicion. *See* ¶21, above. Those rather vague and generalized questions were about these subjects: the videos were "evidence of a possible crime"; the videos "might play a significant role in this case"; the videos "could be significant to both the prosecution and defense"; the videos "might be evaluated" by the prosecution and defense; and the like. Those questions and answers were limited to areas that do not directly concern whether the videos contained exculpatory evidence. The officers' testimony was, at most, that the videos would give defense counsel a basis to advise Revels regarding the elements of the crimes or a motion to suppress. Revels tries to re-frame the questions and answers in a manner unsupported by the testimony in an attempt to buttress an assertion regarding exculpatory evidence. But, the officers were not asked about that. The testimony of the officers does not lead to the conclusion that the officers said there was exculpatory evidence on these videos and, as a result, is not a basis to state that the Meyer body-worn camera video was apparently exculpatory.

¶48    The other reason given by the circuit court that this video was apparently exculpatory is that, according to the court, there is a "lack of consistency between what Officer Smith believed Officer Meyer told him and what Officer Meyer believed his testimony would be." That statement is not explained by the circuit court, and there is nothing material in any argument from Revels or from the testimony of either officer (or their reports) that contradicts the testimony of the other officer.

¶49    Moreover, the record establishes that Revels has failed to show that the Meyer body-worn camera video was apparently exculpatory. A "mere possibility" that evidence may be exculpatory does not prove that the evidence was apparently exculpatory. *Munford*, 330 Wis. 2d 575, ¶23. Meyer's detailed written report of what he observed on the night in question, based in part on what he saw on the video in order to prepare his report, does not contain exculpatory evidence.[19] That report is summarized and quoted at ¶4, above. It states the inquiries to Revels from Meyer and the responses. The report states material details regarding Meyer's interactions with Revels which I repeat here:

> By this time, I smelled a strong odor of intoxicants emitting from Rory's vehicle. Rory also presented with glassy, watery and bloodshot eyes. Rory also presented with slurred speech, slowed response time to my questions and slowed movements. From my training and experience, I know these to be possible clues of alcohol intoxication.
>
> … I asked Rory where he was coming from and he stated he was coming from the Wisconsin Dells area. I asked Rory to tell me how he got to Baraboo. Rory was unable to explain to me how he got to Baraboo or where he came from in terms of his location for consuming alcoholic beverage[]s.

The observations of Meyer detailed in his report establish that there was reasonable suspicion that Revels had been operating a motor vehicle under the influence of alcohol. *See* *Washington*, 2005 WI App 123, ¶16. Those same observations of Meyer were repeated to Smith by Meyer upon Smith's arrival and

---

[19] The circuit court found that Meyer reviewed his body-worn camera video for purposes of writing his report. "In this particular case the body camera was used for the benefit of Officer Meyer. He indicated that he did review it for purposes of writing his report." There is no assertion, and no basis in this record for such an assertion, that Meyer's use of his body-worn camera video to prepare his report was improper. That is not alleged as a ground for dismissal in Revels' motion, and both of the written policies of the Baraboo Police Department that are relied on by Revels state that the videos can be used to write reports.

are described in Smith's report quoted in ¶6, above. The signs of intoxication exhibited to Meyer by Revels were then confirmed a few minutes later when Smith spoke to Revels as noted in Smith's report quoted in ¶7, above.

¶50     The circuit court made no finding that the statements in the officers' reports, or their testimony about the reports, were not credible. Revels produces no information in this record that contradicts the information in Meyer's written report or his testimony at the hearing about what happened after Meyer approached Revels' car and spoke to him. Revels produces nothing to show that the Meyer squad car camera video would contradict in any material way what Meyer said in his written report or his testimony at the hearing regarding that interaction.[20]  As a result, Revels does not allege any factual basis that this video would have revealed apparently exculpatory evidence. The record establishes that the Meyer body-worn camera video contained only inculpatory evidence.

¶51     Revels states in briefing in this court that, at the hearing, Meyer "could not recall what questions he asked Revels … or the order in which he asked them." That is not accurate. At the time of the hearing, Meyer could not recall the "exact questions … asked" or the "exact" order he asked the questions of Revels. In any case, Revels does not explain in any discernable manner why the exact wording of the questions or the exact order of the questions makes a difference

_____

[20] In briefing in this court, Revels asserts that Meyer prepared his written report approximately forty hours (less than two days) after the Revels incident occurred. Chief Schauf testified that it is standard practice for officers to prepare reports at the end of the shift, but not a requirement. As discussed, Meyer had lost his voice and went home for that reason at the end of his shift after his interaction with Revels. Meyer testified that his memory of events would have been somewhat clearer immediately after the interaction with Revels rather than forty hours later. But, he also testified that he reviewed his body-worn camera video in preparing his report, and that video assisted his memory of events. Importantly, his memory of events at the time of the hearing matched the information in his report.

regarding the purportedly exculpatory nature of this video. Further, the fact that Meyer did not have a perfect memory of all details of his exchange with Revels at the time of the hearing does not turn his body-worn camera video into apparently exculpatory evidence.[21]

¶52 In sum, Revels has not met his burden to show that the Meyer body-worn camera video was apparently exculpatory.[22]

¶53 The analysis to this point is enough to reverse the order of the circuit court, but I take up one more issue regarding the Meyer body-worn camera video.

**F. There is Comparable Evidence for the Meyer Body-Worn Camera Video.**

¶54 Revels must prove one other matter regarding the Meyer body-worn camera video in order to succeed on his motion to dismiss. "In order to establish that the State violated his due process rights by destroying apparently exculpatory evidence," a defendant must demonstrate that "the evidence is 'of such a nature that the defendant [is] unable to obtain comparable evidence by other reasonably available means.'" *Munford*, 330 Wis. 2d 575, ¶21; *see also Greenwold*, 189 Wis. 2d at 67. Revels states in conclusory fashion that no comparable evidence

---

[21] This matter took time to get to an evidentiary hearing. The complaint was filed on March 3, 2020. In May 2020, Revels' counsel was informed that the videos were not preserved. Revels' motion to dismiss was filed on September 29, 2020. It took six months from that date before the evidentiary hearing was held. In light of the fact that it took more than a year from the filing of the complaint to the date of the evidentiary hearing, it is hardly surprising that Meyer stated at the hearing that his memory of his interactions with Revels was not perfect.

[22] Revels mentions in briefing in this court that the Meyer body-worn camera video might have shown Revels' car when Meyer was pulling in behind Revels' truck and before Meyer exited the squad car. However, there is no basis in the record to show that the Meyer body-worn camera video would have shown Revels' truck. It was Revels' burden to show this, he has not done so, and this assertion does not support his motion to dismiss.

exists for the Meyer body-worn camera video. I disagree for the following reasons.

¶55 In its decision, the circuit court stated: "The nature of this offense at some point would have been shown through I believe Officer Smith's body camera of exactly what condition Mr. Revels was in."[23] The circuit court did not connect that statement to the issue discussed in this section of this opinion. But, from that, it necessarily follows that the Smith body-worn camera video would have shown evidence comparable to what was on Meyer's body-worn camera video.

¶56 The Meyer body-worn camera video would have contained evidence of reasonable suspicion because, according to Meyer's report and his testimony, it shows Revels' indications of intoxication as already noted. It is not disputed that the Smith body-worn camera video started, at the latest, a short time after Meyer's personal interaction with Revels. The Smith body-worn camera video, according to the written report of Smith and his testimony, shows Smith's interactions with Revels, which were very similar to that seen and heard by Meyer. The Smith video also shows the lengthy OWI field sobriety testing. There is no basis in this record to conclude, and Revels does not meaningfully argue, that Revels had one set of indications for intoxication when Meyer interacted with him and a different set of indications for intoxication when Smith interacted with him a few minutes later.

---

[23] Revels does not dispute that Smith preserved his own body-worn camera video and that it was made available to Revels in discovery.

¶57 Therefore, even if the Meyer body-worn camera video was apparently exculpatory (and it was not), Revels' argument regarding that video fails because he has not met his burden to show that there is no comparable evidence for the Meyer body-worn camera video.[24]

## CONCLUSION

¶58 For the foregoing reasons, Revels' motion failed, the order of the circuit court is reversed, and the cause is remanded for further proceedings.

*By the Court.*—Order reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[24] The issues already resolved are dispositive, and I need not reach the question of whether the remedy of dismissal granted by the circuit court was appropriate.