State of Wisconsin, Plaintiff-Appellant,†

v.

Kyle Lee Huggett, Defendant-Respondent.

Court of Appeals

*No. 2009AP1684–CR. Submitted on briefs January 27, 2010.*
*—Decided April 6, 2010.*

2010 WI App 69

(Also reported in 783 N.W.2d 675.)

† Petition for Review denied w/o costs 7/21/10.

786

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *J.B. Van Hollen*, attorney general, and *James M. Freimuth*, assistant attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Craig Mastantuono* and *Rebecca M. Coffee* of *Mastantuono Law Office, S.C.*, Milwaukee.

Before Hoover, P.J., Peterson and Brunner, JJ.

¶ 1. HOOVER, P.J. The State appeals an order dismissing, with prejudice, a single charge of second-degree intentional homicide. The circuit court dismissed the case due to the State's failure to preserve apparently exculpatory evidence consisting of threatening voicemail messages left on two cell phones. Kyle Huggett claimed he acted in perfect self-defense and defense of others. The lost voicemail messages were from the victim, who broke into Huggett's home. The State argues: (1) we incorrectly decided the leading evidence preservation case, *State v. Greenwold*, 189 Wis. 2d 59, 525 N.W.2d 294 (Ct. App. 1994) (*Greenwold II*); (2) Huggett is not entitled to any remedy because the voicemail messages were not in the State's exclusive control and comparable evidence was available; and (3) the circuit court erroneously exercised its discretion by dismissing the case rather than ordering a less severe remedy. We reject the State's arguments and affirm.

## BACKGROUND

¶ 2. Huggett and his pregnant girlfriend, Amy Kerbel, resided together, along with Kerbel's five-year-old son. John Peach, Kerbel's former boyfriend and father of her son, left voicemail and text messages on Huggett's and Kerbel's respective cell phones on January 20, 2008. Peach had also sent text messages in the week preceding that date. All of the voicemail and text messages were reportedly threatening. After receiving the voicemails on the twentieth, Kerbel and Huggett listened to the other's message, and planned that if Peach came to the residence, Kerbel would retreat to a bedroom with her son and call 911.

789

¶ 3. Later that night, around 10:00 p.m., Peach arrived at the home. Huggett stated he also saw a second person outside the home.[1] Kerbel went to the bedroom and called 911. Meanwhile, Huggett retrieved and loaded a handgun. Peach broke down the locked entry door and entered the home. Huggett stated he fired two shots as Peach was advancing toward him, and Peach then ran back out the door. Huggett thought Peach left because he saw a truck driving away. However, he was later found in the yard dead with two gunshot wounds to the chest.

¶ 4. Sheriff's Deputy Joanna Bartosh was the first officer to arrive at the scene. She immediately asked Huggett what happened. Huggett replied, "He broke into my – or I shot him. He broke into my house. I thought he was going to kill me." Bartosh arrested Huggett and seized his cell phone. She then spoke with Kerbel, who told Bartosh about the threatening text and voicemail messages. Bartosh listened to Kerbel's voicemail and immediately realized the message had evidentiary value and, with Kerbel's permission, took the cell phone and voicemail pass code. Bartosh also viewed some of the text messages at that time and began copying them down. She noted the following two messages: "I will b there when the games over im in crazy mode now fuck u its go n down bitch" and "Fu bitch hes fucked 2 nite things will get real[.]"

¶ 5. Deputy Julie Mead subsequently interviewed Kerbel at the scene. Kerbel also told Mead that Peach sent threatening text and voice messages prior to coming

---

[1] According to an affidavit in support of a document subpoena, further investigation revealed that two other men accompanied Peach to the home.

to the home, and that they were available on Kerbel's phone. Mead retrieved the phone and transported it to the sheriff's department as evidence.

¶ 6. During the early morning hours of January 21, detective Tracy Finch interviewed Huggett at the sheriff's department. Huggett waived his rights and answered Finch's questions, and was described as cooperative. He also claimed he acted in self-defense and mentioned the text and voicemail messages on both phones. When asked later in the interview about the content of the messages, Huggett responded by asking whether Finch had already heard them. When Finch replied she had not, Huggett explained Peach was screaming in the voicemail messages, and that all of the messages, including texts, were threats to harm Huggett. Finch did not request consent to search Huggett's phone. On January 23, Kerbel was interviewed again, this time by Finch. Kerbel reiterated that it would be okay to look at her phone.

¶ 7. The sheriff's department later sought a document subpoena for "the contents of the . . . cell phones, particularly any text messages stored thereon . . . ."[2] On January 30, the department served the subpoena on

---

[2] Further, after noting the reported threatening text messages in the week preceding the incident, the sheriff's department's affidavit in support of the document subpoena stated:

Kerb[e]l further informed Deputy Bartosh that additional cell phone communication had been going on between the parties earlier [that day], consisting of both text and voice mail messages. Kerb[e]l displayed the text messages and played the voicemail messages for the officer. She then agreed to surrender the phone to the officer as evidence for the investigation and also provided Deputy Bartosh with the pass code to access the contents of the cell phone.

Alltel,[3] requesting "Billing statements, account records, internet usage, T-Zone usage, IM usage, text messages, or any other records in any form . . . ." Alltel promptly[4] responded by fax, indicating, "There is no text message data available for the time period requested. All other information has been provided." Alltel's response did not include any voicemail recordings.

¶ 8. Eventually, on March 11, 2008, the sheriff's department sought and obtained a search warrant for the phones to recover "text messages, call logs/records, and any other records in any form . . . ." Deputy Mead was able to recover threatening text messages from the day of the incident. However, she could not retrieve Kerbel's voicemail and did not attempt to recover any voicemail from Huggett's phone. In fact, Mead testified she never attempted to retrieve any messages from Huggett's phone, was never asked to, and was unaware of any such message until she viewed a memo from defense counsel in mid-February 2009.

¶ 9. Huggett was charged on May 13, 2008. On June 3, Huggett's counsel requested that the district attorney preserve all messages and recordings on the cell phones. Following the preliminary hearing on July 16, Huggett's counsel filed a formal discovery demand, which specifically included the phone messages. After further requests, on February 25, 2009, the State informed Huggett it had not preserved the voicemails and could no longer access them.

¶ 10. Huggett moved to dismiss the case the next day, and an evidentiary hearing was held the following

---

[3] Alltel was both Huggett's and Kerbel's cell phone service provider, but they had separate accounts.

[4] Alltel dated the fax cover sheet February 1, but the data transmission printout on that document indicates February 4.

day. Subsequently, the parties submitted further briefs, the state crime lab confirmed no messages could be recovered from the phones, and Huggett obtained, via subpoena, a letter from Alltel explaining that voicemail messages are only saved for about seven days. On May 29, the circuit court issued a written decision dismissing the case with prejudice. The State appeals.

## DISCUSSION

¶ 11. The State first argues we incorrectly decided *Greenwold II*, which sets forth two different due process tests depending on whether lost evidence is apparently exculpatory or merely potentially exculpatory. There, we held: "A defendant's due process rights are violated if the police: (1) failed to preserve the evidence that is apparently exculpatory; or (2) acted in bad faith by failing to preserve evidence which is potentially exculpatory." *See Greenwold II*, 189 Wis. 2d at 67–68 (citing *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988)); *State v. Greenwold*, 181 Wis. 2d 881, 885–86, 512 N.W.2d 237 (Ct. App. 1994) (*Greenwold I*)).[5] We explained:

> [T]he *Youngblood* analysis suggests that if the materiality of the evidence rises above being potentially useful to clearly exculpatory, a bad faith analysis need not be evoked; the defendant's due process rights are violated because of the apparently exculpatory nature of the evidence not preserved.

*Greenwold II*, 189 Wis. 2d at 68.

---

[5] In *Greenwold I*, we held, "[U]nless the evidence was apparently exculpatory, or unless the officers acted in bad faith, no due process violation resulted." *State v. Greenwold*, 181 Wis. 2d 881, 885, 512 N.W.2d 237 (Ct. App. 1994). Concluding the evidence in that case was only potentially exculpatory, we then remanded for the circuit court to conduct a bad faith analysis. *Id.* at 885–86.

¶ 12. The State contends we misinterpreted *Youngblood*, and that, instead, bad faith must be shown in all cases, regardless whether the evidence is potentially or apparently exculpatory. We reject the State's argument for two independent reasons.

¶ 13. First, as the State acknowledges, we are bound by our precedent set forth in *Greenwold I* and *Greenwold II*. *See Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997) (court of appeals may not overrule, modify, or withdraw language from a prior published opinion). Nonetheless, the State indicates it presents the argument to preserve it for review by the supreme court, and also asks us to signal our disfavor with the *Greenwold* analysis. We decline that invitation; rather, we reaffirm the *Greenwold I* and *Greenwold II* decisions and state our belief those cases properly set forth the due process test for cases involving the State's failure to preserve evidence. We do not find the State's argument to the contrary persuasive.

¶ 14. Second, we conclude the State forfeited its argument by applying the *Greenwold II* analysis in the circuit court and not challenging its application.[6] *See State v. Huebner*, 2000 WI 59, ¶¶ 10–12, 235 Wis. 2d 486, 611 N.W.2d 727. Indeed, at the hearing on Huggett's motion to dismiss, the State represented:

> I will tell you what is not going to be a point of contention. I'm not going to sit here as an officer of the court, as district attorney, and an advocate for justice and tell the Court that this evidence is not exculpatory or apparently exculpatory. Of course what that does in

---

[6] We also note it was the State that successfully appealed in both *Greenwold* cases, leading to the current test adopted in those cases.

the *Youngblood* line of cases is render the issue of good faith irrelevant here, at least to that extent.

In its reply brief, the State concedes it forfeited the argument, but asks us to exercise our discretion to nonetheless address the issue and certify it to the supreme court. Again, we decline.

¶ 15. The State next argues there was no due process violation because the voicemail messages were not in the State's exclusive control and because there was comparable evidence available. Concerning exclusive control, the State emphasizes Huggett and Kerbel could have listened to and tape-recorded their cell phone voicemail messages by calling in from another telephone. At the motion hearing, Huggett acknowledged the ability to access his voicemail from another phone, but testified it was not something he routinely did. When asked why he did not do so after his release from jail, Huggett stated, "Because they had my phone, it didn't occur to me." Kerbel twice testified she could not access her messages remotely but, when asked a third time in a different manner, responded "I'm not – yeah, I think you actually might be able to." She stated, however, she had never done that.

¶ 16. We first observe the State does not cite any cases setting forth an "exclusive possession" requirement as an element of the due process test when apparently exculpatory evidence is not preserved. Rather, the State cites *State v. Sarinske*, 91 Wis. 2d 14, 36, 280 N.W.2d 725 (1979), which is a duty to disclose case involving the *Brady* rule. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). The State also quotes *United States v. Sepulveda*, 15 F.3d 1161, 1195 (1st Cir. 1993). That case, however, involved merely potentially excul-

patory evidence and, furthermore, does not mention an exclusive possession requirement. The State provides no argument that either case should be extended to the present context.

¶ 17. This is a rather unusual case in that, while the physical evidence was solely within the State's possession, the concomitant electronic evidence was stored elsewhere and could have been accessed by both the State and the defense. Given the facts of this case, however, it was reasonable for Huggett to expect that the State would preserve the voicemail recordings. The sheriff's department was immediately aware of the apparently exculpatory value of the evidence and confiscated the cell phones as part of its investigation. It knew, or should have known, that the voice recordings would be automatically deleted by the cell phone provider at some point in time—this is common knowledge. Additionally, the department was in a better position to preserve the evidence given its collective investigatory experience and access to necessary technical equipment.

¶ 18. By creating an expectation of preservation, the State became responsible for ensuring that it occurred. Huggett was not charged with any crime until nearly four months after the incident—long after the apparently exculpatory evidence had been destroyed. It would be fundamentally unfair for the State to induce reliance and then place the responsibility on Huggett for failing to seek and preserve the evidence prior to ever being charged.

¶ 19. Additionally, we rejected an exclusive possession argument in *State v. Hahn*, 132 Wis. 2d 351, 392 N.W.2d 464 (Ct. App. 1986), which has some similarities with this case. There too, the apparently exculpatory

evidence was destroyed while in the possession of a third party, a private garage. We stated:

> Defendant's truck had an apparent exculpatory value which the state recognized, evidenced by its impoundment of the vehicle.
>
> [W]hen the sheriff's department told defendant that his truck had been impounded, he had no reason to believe that any action he might take regarding the vehicle, such as signing its title, would affect the impoundment. While defendant's act of signing the truck's title may have initiated a chain of events which resulted in the destruction of his truck, defendant's action has no relationship to the state's duty to preserve evidence.

*Id.* at 360.[7] Without explicitly accepting or rejecting an *exclusive* possession requirement, we merely "conclude[d] that the state had possession of the vehicle." *Id.* at 358. We then applied the then-current due process test. *Id.*

¶ 20. In a minimally developed related argument, the State stresses the lack of state action in destroying the evidence, citing three nonbinding cases. The State argues it should not be held responsible for Alltel's destruction of the voicemail messages. It is irrelevant, however, whether the State affirmatively destroyed evidence or passively allowed it to be destroyed. *See id.* at 357–60; *Greenwold II*, 189 Wis. 2d at 67 (referring to

---

[7] While *State v. Hahn*, 132 Wis. 2d 351, 360, 392 N.W.2d 464 (Ct. App. 1986), referred to the evidence's "apparent exculpatory value," that case was decided prior to *Arizona v. Youngblood*, 488 U.S. 51 (1988), and *Greenwold I*, which discussed *Hahn*. Thus, we recognize *Hahn* was not necessarily distinguishing between potentially and apparently exculpatory evidence as those terms are utilized in the subsequent cases.

"evidence not preserved, lost, or destroyed by the State"). In either event, the State failed in its duty to preserve evidence. Here, the State made no attempt to record the messages, much less listen to and contemporaneously document their content, until over two and one- half months after the incident. Even then, no attempt was made to access Huggett's voicemail messages.

¶ 21. We next address the State's argument that comparable evidence was available to Huggett. In order to rise to the level of a due process violation, the lost evidence "must . . . be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Greenwold II*, 189 Wis. 2d at 67 (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)). "In *Trombetta*, the Court focused its analysis on the defendant's right to fundamental fairness by giving the defendant a chance to present a complete defense." *Id.* (citing *Trombetta*, 467 U.S. at 485).

¶ 22. The State argues Huggett had access to comparable evidence through witness testimony and the preserved text messages. We reject this contention. Although Huggett and Kerbel both recalled generally that Peach's messages were threatening, neither could sufficiently recall the precise language used. Kerbel was unable to recall any of the words used in either message, and did not listen to the entire message left on Huggett's phone. Huggett only remembered some of the language, consisting of two phrases. Deputy Bartosh listened only to the message on Kerbel's phone, and

only part of it. She could only recall that she came away with the perception that the message should be preserved.

¶ 23. Furthermore, mere descriptions of the messages could not adequately convey Peach's tone, which was described as "angry and yelling," and "a lot of yelling, and screaming, and very threatening tone." Simply put, there is no replacement for a live recording of the threats screamed at Huggett shortly before Peach broke down the door to Huggett's home. The messages would be central to the jury's application of the self-defense and defense of others standard, which requires that Huggett subjectively believed it was necessary to use deadly force against Peach to prevent imminent death or great bodily harm to himself or the home's other occupants, and that his belief was objectively reasonable under the circumstances. *See* WIS. STAT. § 939.48(1) (2007–08).[8]

¶ 24. Similarly, the text messages, by their very nature, could not convey Peach's tone. Further, they likely would not carry the same weight as a "live" threat. It is one thing to type a nasty text message or email and press send; it is quite another to call a person to convey threats directly.

¶ 25. Finally, we address, and reject, the State's challenge to the circuit court's choice of dismissal as the remedy. Quoting *Hahn*, the State acknowledges that

---

[8] *See also* WIS JI—CRIMINAL 1052, at 3–4 (May 2006) ("The reasonableness of the defendant's belief must be determined from the standpoint of the defendant at the time of [his] acts . . . . The standard is what a person of ordinary intelligence and prudence would have believed in the position of the defendant under the circumstances existing at the time of the alleged offense.").

"[w]hen the government has destroyed [or lost] criminal evidence, the imposition of a sanction is within the court's discretion." *Hahn*, 132 Wis. 2d at 361. There, we cited federal cases "which held that the determination of the sanction depends on a balancing of the quality of the government's conduct and the degree of prejudice to the accused." *Id.* at 362. *Hahn*, however, preceded *Greenwold I* and *II*, which established the government's good or bad faith as irrelevant to whether a due process violation occurred in cases involving apparently exculpatory evidence. Thus, it is unclear whether the balancing test referenced in *Hahn* remains viable.[9] We need not, however, resolve that issue here.

¶ 26. The State argues, "While dismissal may be proper where the State has acted in bad faith in failing to preserve exculpatory evidence (at least 'apparently exculpatory' evidence), dismissal should not be an automatic remedy in cases" not involving bad faith.[10] The State argues a better remedy here would have been to instruct the jury to accept the truthfulness and characterizations of Peach's alleged voicemail threats. The State complains dismissal is an unfairly harsh sanction because the State did not act in bad faith, Huggett can present other evidence of Peach's threats, and the messages "add little to resolving the disputed issue of whether Huggett's subjective profession of self-defense was *objectively* reasonable." We disagree with the State's third proffered reason. The tone and content of the

---

[9] The *Greenwold* decisions, which involved potentially exculpatory evidence, did not address the remedy issue because it was determined there was no due process violation. We are aware of no published evidence destruction cases in Wisconsin decided subsequent to *Greenwold II*.

[10] We note this argument appears premised on the State's view that *Greenwold II* was wrongly decided.

voice messages would be highly relevant to both the subjective and objective components of the self-defense standard.

¶ 27. Further, contrary to the State's suggestion, the circuit court did not select dismissal as the automatic remedy. Rather, at the motion hearing the court recognized dismissal was "the most Draconian sanction possible," and indicated it was hesitant to grant it. The court repeatedly referred to dismissal as an "extraordinary remedy" and commented that, under *Hahn*, it was "a discretionary call for the Court." Only after ordering further briefing by the parties did the court decide dismissal was the proper remedy. The court's written decision addresses the State's and Huggett's conduct vis-à-vis the loss of evidence, the import of the evidence, and the effect on Huggett's ability to present a complete defense, indicating, in part:

> This Court believes that any trier of fact, in order to comport with the due process clause, would need to listen to at least one, and, even better, both voice mail messages in order to determine whether or not Huggett's actions were a reasonable or an unreasonable exercise of the privilege of self-defense.
>
> . . . .
>
> Because what may well be characterized as the most important pieces of exculpatory evidence were not preserved by law enforcement officers, Mr. Huggett's due process rights have been denied.
>
> This evidence simply cannot be adequately reconstructed by any other means, and the only sanction left to this Court is dismissal . . . .

■

¶ 28. As in *Hahn*, we cannot conclude the court committed an erroneous exercise of discretion. "To find an [erroneous exercise] of discretion an appellate court

801

must find either that discretion was not exercised or that there was no reasonable basis for the trial court's decision." *Wisconsin Pub. Serv. Corp. v. Krist*, 104 Wis. 2d 381, 395, 311 N.W.2d 624 (1981). Because the circuit court demonstrated a reasonable basis for its conclusion, we accept its choice of sanction. *See Hahn*, 132 Wis. 2d at 363.

*By the Court.*—Order affirmed.