COURT OF APPEALS
DECISION
DATED AND FILED

April 21, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1968-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF341

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

STAVROS GEORGE ILIOPOULOS,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Oneida County: MICHAEL H. BLOOM, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Stavros George Iliopoulos appeals from a judgment convicting him of child enticement, false imprisonment, and first-degree

sexual assault of a child (sexual contact with a child under age 13). Iliopoulos argues that the State violated his right to due process by failing to preserve the original version of a surveillance video, which Iliopoulos contends was apparently exculpatory. We reject this argument and affirm.

## BACKGROUND

¶2 According to the criminal complaint, on November 20, 2018, ten-year-old Mary[1] reported that Iliopoulos, a janitor at her elementary school, had sexually assaulted her at school earlier that day. Mary told a forensic interviewer that when she left her classroom to use the restroom, she saw Iliopoulos standing outside of the restroom. He asked her for a hug, and she refused. He then took her into a closet near the restroom, closed the door, and began hugging her.[2] Mary reported that Iliopoulos also kissed her on the lips and neck; pulled up her shirt and touched her breast over her bra; kissed her stomach; and put his hand down her pants and inside her underwear and touched "the side of her leg toward the back of her buttocks." Iliopoulos eventually stopped, told Mary not to tell anyone, and let her out of the closet.

¶3 The complaint further recounted that Sergeant Greg Gardner of the Oneida County Sheriff's Office "reviewed video recordings of the hallway outside of the bathroom and the closet at the school" from the day of the alleged assault. According to the complaint:

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2023-24), we refer to the victim using a pseudonym. All references to the Wisconsin Statutes are to the 2023-24 version.

[2] It is undisputed that the closet where the assault allegedly occurred was a janitor's closet.

> At 11:08:47, Iliopoulos is seen in the hallway as Mary exits a classroom, briefly stops in front of Iliopoulos and immediately enters the girls restroom and Iliopoulos walks down the hallway. At 11:09:35 Iliopoulos returns down the hallway, then turns right into the alcove for the girls restroom where the door to the closet is also located. A different camera angle shows both Iliopoulos and Mary walk toward the closet. At 11:14:46, Mary walks back to the classroom, and at 11:16:48, Iliopoulos walks from the alcove.

¶4    During an interview with law enforcement following the alleged assault, Iliopoulos stated that he was in a closet near the girls' restroom when a girl came over to him, asked what was in the closet, and came into the closet. Iliopoulos stated that the door closed automatically, but he immediately opened it and pushed the girl out of the closet, telling her to "get the hell out of here." Iliopoulos then told the girl not to tell anyone about being in the closet.

¶5    In September 2019, a jury found Iliopoulos guilty of all three of the charges against him. Iliopoulos filed a postconviction motion for a new trial, alleging ineffective assistance of trial counsel. The circuit court granted that motion and vacated Iliopoulos's judgment of conviction.

¶6    Iliopoulos, represented by new counsel, subsequently moved to dismiss the complaint, alleging that the State had violated his right to due process by failing to preserve apparently exculpatory evidence—namely, the original surveillance video from the "East Hall" camera inside Mary's school. As background, this case involves surveillance videos from two cameras in the school: the East Hall camera and the Interior Hall camera. Neither camera captured the door of the closet where Mary alleged that the assault took place. Instead, the East Hall camera was positioned at the end of a hallway, with the alcove containing the closet and the girls' restroom located on the right side of the hallway about halfway between the camera and a set of exterior doors at the

hallway's other end. The Interior Hall camera, in turn, was positioned across from the alcove but was angled so that the closet door and the entrance to the girls' restroom were hidden behind a wall.

¶7    It is undisputed that the State failed to preserve the original surveillance video from the East Hall camera.[3] However, before the original video was destroyed, the school district's network administrator helped law enforcement make a copy of the video by using "screen-capturing software" to record what appeared on a monitor while the original video was being played from the school district's server. The same method was used to make a copy of the video from the Interior Hall camera. We will refer to these screen-captured videos, respectively, as the "East Hall video" and the "Interior Hall video." In addition to the two screen-captured videos, two original video clips from the Interior Hall camera were preserved, both of which depicted events that were also included in the longer, screen-captured version on the Interior Hall video.[4]

¶8    The parties agree that the East Hall video shows the following.[5] The video begins at 11:01:09 a.m. At 11:01:15, Iliopoulos enters the camera's view

---

[3] The original video from the East Hall camera was apparently destroyed pursuant to the school district's 15-day data retention policy for surveillance videos.

[4] It is unclear from the record and the parties' briefs why the original video from the East Hall camera was destroyed pursuant to the school district's data retention policy, but two original video clips from the Interior Hall camera were retained.

[5] The East Hall video shows a clock on the bottom right of the screen that indicates the time and date when the screen-captured recording of the original video was made. Above that is another clock purporting to show the time and date of the events depicted in the video, using the time recorded by the server that controls the school district's surveillance cameras. The time stamps discussed above are taken from the server clock.

Additionally, the State notes in its brief that although the East Hall camera was motion activated, the video "remains essentially continuous … because [the camera] is positioned near a classroom full of students moving around."

from the bottom of the frame and walks up the hallway, away from the camera. At 11:01:35, Iliopoulos enters a room at the far end of the hallway and exits from the camera's view. At 11:08:38, Iliopoulos re-enters the hallway and walks back toward the camera. At 11:08:41, Mary enters the hallway from the left, turns toward Iliopoulos, and stands in front of him with her hands on her hips outside of the restroom alcove. Mary then proceeds into the alcove at 11:08:46. Iliopoulos then walks down the hallway toward the camera before disappearing from view. At 11:09:18, Iliopoulos reappears at the bottom of the frame and walks back up the hallway, before entering the alcove and leaving the camera's view at 11:09:34.

¶9    Thereafter, the East Hall video shows a student walking up the hallway and entering the restroom alcove at 11:11:15. At 11:11:23, a male teacher enters the hallway and proceeds to use a photocopier outside of the alcove before leaving the area at 11:11:45. At 11:14:10, a female teacher exits a room at the far end of the hallway and then walks past the alcove before entering the room next to it at 11:14:29. The video ultimately shows Iliopoulos leaving the alcove at 11:16:44 before walking down the hallway toward the camera and out of the frame.

¶10    It is undisputed that there are three irregularities or discrepancies regarding the East Hall video. First, Sergeant Gardner's report, which was introduced into evidence at the hearing on Iliopoulos's motion to dismiss, states that on the day of the alleged assault, Gardner reviewed video footage from the East Hall camera and "observed [Mary] exit the bathroom and return to [her] classroom" at 11:14:46. The screen-captured version of the East Hall video, however, does not show Mary leaving the restroom alcove at 11:14:46 or at any other time. Iliopoulos concedes that there is no "discontinuity in the server time stamp or in the activities of the children visible in the foreground that would

suggest a portion of the video was cut." Instead, Iliopoulos posits that "[t]he only reasonable explanation for Mary's absence from the East Hall video is that there was some sort of 'glitch,' as the circuit court put it, with the screen-capturing process."

¶11 Second, at 11:15:23 on the East Hall video, students and a female teacher suddenly appear in the hallway. However, there is no apparent discrepancy or "jump" in the server time stamp at that point in the video.

¶12 Third, the East Hall video is 14 minutes and 25 seconds long. Based on the server time stamps shown on the video, however, the video covers 15 minutes and 49 seconds of time.

¶13 The Interior Hall video depicts many of the same events as the East Hall video.[6] The Interior Hall video begins at 11:04:46. At 11:08:42, Mary can be seen entering the restroom alcove. At 11:09:28, Iliopoulos enters the alcove. At 11:10:53, a student walks into the alcove and enters the boys' restroom. At

---

[6] It is undisputed that, like the East Hall camera, the Interior Hall camera was motion activated. However, because the camera was not detecting continuous motion during the relevant time period, the Interior Hall video is comprised of a series of shorter video segments, each of which was created when the camera's motion detector was activated.

Additionally, unlike the East Hall video, the Interior Hall video contains two time stamps—the server time stamp (which was also present on the East Hall video) and the camera time stamp. At the beginning of the video, the server time stamp reads 11:04:46, while the camera time stamp reads 11:07:53. The school district's network administrator testified at the hearing on Iliopoulos's motion to dismiss that the server time stamp is more accurate than the camera time stamp because the server "actually goes out to a global time clock to save its time and date." When asked why the camera time stamp was present on the Interior Hall video but not the East Hall video, the network administrator responded, "It's a button click whether it displays on the recording or not." The times discussed above in our summary of the Interior Hall video correspond to the server time stamps.

11:14:36, Mary leaves the alcove. The Interior Hall video ends at 11:15:36. It does not show Iliopoulos leaving the alcove.

¶14 As Iliopoulos notes, there is also a discrepancy or irregularity in the Interior Hall video. Specifically, 17 seconds into the video, Mary exits the restroom alcove at 11:14:36, according to the server time stamp. One second later, however, Mary has moved only a short distance, but the server time stamp reads 11:14:50, a 14-second increase.

¶15 In his motion to dismiss, Iliopoulos conceded that he did not "allege bad faith on the part of anyone involved" with respect to the State's failure to preserve the original East Hall video. He argued, however, that the original East Hall video was apparently exculpatory because "the video footage … does not show [him] committing any offense"; "[i]t does not show the victim fleeing, or appearing upset, or leaving an area with her clothes in disarray"; and it "does not show the victim spending an unusual amount of time in the bathroom." He further argued, based on the discrepancies discussed above, that there were "problems with the timeline created by the evidence submitted." Iliopoulos also asserted that he could not obtain comparable evidence because "[t]he security cameras in the school operate on a sophisticated network and capture an area that is by design not viewable by the public."

¶16 Following an evidentiary hearing, the circuit court denied Iliopoulos's motion to dismiss. First, the court concluded that the evidence the State had failed to preserve was not apparently exculpatory. The court reasoned that the situation would be different if the State had failed to preserve a video that actually showed the closet where the alleged assault occurred or a video showing that Iliopoulos left the restroom area before Mary.

7

¶17   Second, the circuit court concluded that even if the video evidence was apparently exculpatory, Iliopoulos had failed to show that he lacked access to comparable evidence.  The court explained that the available videos—i.e., the screen-captured versions of the East Hall video and the Interior Hall video and the original video clips from the Interior Hall camera—"more or less depict[ed] the accurate time frame within which the alleged victim entered the bathroom, the defendant entered that area, and both of them exited, the alleged victim before the defendant."  The court also noted that the Interior Hall video showed Mary's appearance both when she entered and exited the restroom alcove, and the defense could therefore use that video to "make whatever arguments are available to point out the manner in which her clothing looked when she walked into the bathroom" and "the manner in which her clothing looked when she walked out of the bathroom after allegedly having her shirt pulled up, limbs stuck down her pants, et cetera."

¶18   Iliopoulos's case proceeded to a second jury trial, during which Mary testified and a video of her forensic interview was played for the jury.  In addition, the State presented evidence that a sexual assault nurse examiner examined Mary on the evening of the alleged assault and swabbed Mary's abdomen, leg, and an area above her right breast that would have been covered by her shirt.  An analyst from the State Crime Laboratory testified that no saliva was detected on any of the swabs.  However, Iliopoulos's DNA was found on the swab taken from the area above Mary's right breast.

¶19   The principal of Mary's elementary school testified that Mary and another student reported the assault to him at about 1:15 p.m. on the day of the alleged assault.  He testified that Mary appeared "scared and upset" when she made the report.  On cross-examination, the principal acknowledged that the

surveillance videos showed an adult using the photocopier outside the alcove at the time of the alleged assault. He also acknowledged that, while the alleged assault was occurring, an adult female walked past the alcove and came "pretty close to the bathroom." The principal further testified that he was in the hallway at one point during the alleged assault and did not hear anything that caught his attention.

¶20 A defense investigator testified that there was a gap of approximately 1.5 inches between the floor and the bottom of the door on the closet where the assault allegedly occurred. He further testified that while he was standing in the hallway, Iliopoulos's attorney went into the closet and tapped her foot against the side of the sink basin and the floor. The investigator testified that he was able to hear the tapping from multiple locations in the hallway. On cross-examination, however, he conceded that this investigation was done after school hours, when students and staff were not present, and that he did not know how hard Iliopoulos's counsel was tapping her foot.

¶21 In her closing argument, Iliopoulos's attorney emphasized that during the approximately five-minute period when the surveillance videos showed that both Mary and Iliopoulos were in the alcove area, the videos also showed "a little boy walking by going into the bathroom," a teacher using the photocopier, and another teacher walking down the hallway past the alcove. Defense counsel emphasized that these individuals "failed to notice" that an assault was occurring. Counsel also argued that Mary's appearance when she left the alcove, as shown in the video footage, was not consistent with her account of having just been sexually assaulted.

¶22    The jury found Iliopoulos guilty of all three charges.  He now appeals, arguing that the circuit court should have granted his motion to dismiss because the State violated his right to due process by failing to preserve the original East Hall video.

## DISCUSSION

¶23    "[T]he due process clause of the Fourteenth Amendment to the United States Constitution imposes a duty on the State to preserve exculpatory evidence."  *State v. Munford*, 2010 WI App 168, ¶20, 330 Wis. 2d 575, 794 N.W.2d 264 (alteration in original; citation omitted).  "When reviewing a claim that evidence was lost or destroyed in violation of due process, we independently apply the constitutional standard to the facts as found by the [circuit] court."  *Id.*

¶24    The State's destruction of evidence violates a defendant's right to due process if the State: (1) failed to preserve evidence that was apparently exculpatory; or (2) acted in bad faith by failing to preserve evidence that was potentially exculpatory.  *Id.*  Here, Iliopoulos does not allege that the State acted in bad faith by failing to preserve the original East Hall video.  Rather, he argues that the original video was apparently exculpatory.  To succeed on this claim, Iliopoulos must show: (1) that the video had an exculpatory value that was apparent to those who had custody of the video before it was destroyed; and (2) that Iliopoulos was unable to obtain comparable evidence by other reasonably available means.  *See id.*, ¶21.

¶25    On appeal, Iliopoulos argues that the original East Hall video was apparently exculpatory because it would have shown that "a teacher walked by the bathroom alcove while the assault was allegedly occurring, but did not intervene," and that another teacher "made photocopies near the alcove between 11:11:23 to

10

11:11:45 a.m.," which was "three minutes before Mary reappeared in the hallway in the original video" and "within Mary's estimation of when the assault was occurring." Iliopoulos argues:

> Mary told investigators that she struggled against Iliopoulos and repeatedly told him to stop while they were in the closet together. Undoubtedly a teacher would have intervened if they had heard Mary's protestations. So if a teacher walked by, and did nothing, that would suggest the teacher did not hear Iliopoulos assaulting Mary. And if a teacher did not hear Iliopoulos assaulting Mary, that in turn would suggest that Iliopoulos was not, in fact, assaulting Mary.

(Citation omitted.)

¶26    As a threshold matter, the State contends that Iliopoulos forfeited this argument by failing to raise it in the circuit court. As the State correctly notes, in the circuit court, Iliopoulos argued that the original East Hall video was apparently exculpatory because it did not show him committing any offense; it did not show Mary fleeing, appearing upset, or leaving the alcove with her clothes in disarray; it did not show Mary spending an unusual amount of time in the restroom; and because there were "problems with the timeline created by the" existing videos. Iliopoulos did not raise any argument in the circuit court that the original video was apparently exculpatory because it showed teachers or other individuals in the hallway during the alleged assault.

¶27    On this record, we agree with the State that Iliopoulos forfeited his current argument that the original East Hall video was apparently exculpatory. *See* ***Tatera v. FMC Corp.***, 2010 WI 90, ¶19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810 ("Arguments raised for the first time on appeal are generally deemed forfeited."); ***State v. Reese***, 2014 WI App 27, ¶14 n.2, 353 Wis. 2d 266, 844 N.W.2d 396 ("This court need not address arguments that are raised for the first

11

time on appeal."). Nevertheless, to forestall a potential future claim for ineffective assistance of counsel, and in the interest of judicial efficiency, we will exercise our discretion to address the merits of Iliopoulos's current argument. *See **State v. Kaczmarski***, 2009 WI App 117, ¶7, 320 Wis. 2d 811, 772 N.W.2d 702 ("Forfeiture is a rule of judicial administration, and whether we apply the rule is a matter addressed to our discretion.").

¶28 We agree with the State that the original East Hall video was not apparently exculpatory—that is, the video did not have an exculpatory value that was apparent to those who had custody of it before it was destroyed. *See **Munford***, 330 Wis. 2d 575, ¶21. Instead, the video was highly inculpatory, as it showed that both Mary and Iliopoulos were in the alcove area at the time when Mary alleged that the assault occurred. Furthermore, the video showed Iliopoulos interacting with Mary before she went into the alcove, walking up and back down the hallway, and then entering the alcove less than one minute later, which supported Mary's statement to the forensic interviewer that Iliopoulos confronted her in the alcove after she left the restroom and then forced her into the closet.

¶29 The fact that the original East Hall video showed individuals outside the alcove at the time of the alleged assault does not mean that the video would have had an exculpatory value that was apparent to those who had custody of the video before it was destroyed. Notably, the assault occurred during the school day when students and staff were present in the school, and the East Hall video shows that at least one classroom door was open at the relevant time, with students inside the classroom moving around and interacting with one another. The East Hall video also shows a teacher using a photocopier outside of the alcove, which presumably would have also made noise. Under these circumstances, we conclude it would not have been apparent to those in custody of the original East Hall video

that the individuals shown in the video walking by the alcove would have been able to hear a sexual assault taking place inside the closet, had such an assault occurred.[7]

¶30    Regardless, even assuming that the original East Hall video was apparently exculpatory, Iliopoulos has failed to show that he was unable to obtain comparable evidence by other reasonably available means. *See id.*    Again, Iliopoulos asserts that the original East Hall video was apparently exculpatory because it showed multiple individuals walking by or near the alcove while the assault was allegedly occurring.    Even without the original East Hall video, however, Iliopoulos was able to prove that fact to the jury using the other, still-existing surveillance videos.

¶31    As Iliopoulos acknowledges in his brief-in-chief, the screen-captured copy of the East Hall video showed all of the relevant events, aside from Mary leaving the alcove.    It showed both Mary and Iliopoulos entering the alcove. Thereafter, it showed a student entering the alcove, a male teacher using a photocopier outside of the alcove, and a female teacher walking past the alcove and entering the room next to it.    The video subsequently showed Iliopoulos leaving the alcove.    The video also showed the times when these events occurred,

---

[7] As noted above, at trial, Iliopoulos introduced evidence that a defense investigator positioned in the hallway was able to hear Iliopoulos's counsel tapping her foot inside the closet. On appeal, however, Iliopoulos develops no argument that such information was known to those in custody of the original East Hall video before the video was destroyed. Moreover, the defense investigator conceded that he performed his investigation after school hours, when students and staff were not present. Additionally, the defense investigator could not say how hard Iliopoulos's counsel was tapping her foot while she was inside the closet. We agree with the State that "[t]he fact that the defense investigator said he could hear Iliopoulos's attorney hitting her foot against the sink in an empty building tells us very little, if anything, about whether a teacher would have been likely to notice Mary speaking in the closet during a busy school day."

based on time stamps from the server, which the school district's network administrator testified was synchronized to a global time clock.

¶32    Although the screen-captured version of the East Hall video did not show Mary leaving the alcove, the Interior Hall video did.  Furthermore, the Interior Hall video showed that before Mary left the alcove, another student entered the alcove and went into the boys' restroom.  Additionally, like the East Hall video, the Interior Hall video contained time stamps from the server, which was synchronized to a global time clock.  Comparing the Interior Hall video and the screen-captured version of the East Hall video, it is clear that Mary left the alcove after the student entered the alcove, after the male teacher used the photocopier, and after the female teacher walked past the alcove.  While it is true that there is a slight glitch in the Interior Hall video after Mary is seen leaving the alcove, that glitch does not alter the fact that the videos—taken together—show multiple individuals walking by the alcove *before* Mary left it—i.e., while the alleged assault was occurring.

¶33    Based on the existing surveillance videos, Iliopoulos's attorney was able to make the same argument to the jury that Iliopoulos now makes on appeal— namely, that multiple individuals walked past or near the alcove during the alleged assault, and that they would have heard something if an assault had actually been occurring in the closet at that time.  As the State aptly notes, "[t]he problem for Iliopoulos was not that the existing footage could not prove the teachers' movements"; rather, the problem "was that this known evidence just wasn't as persuasive as [Iliopoulos] seems to believe it was."

¶34    Additionally, although the screen-captured version of the East Hall video did not show Mary leaving the alcove, Iliopoulos could have introduced

Sergeant Gardner's police report, which expressly stated that on the day of the alleged assault, Gardner reviewed video footage from the East Hall camera and "observed [Mary] exit the bathroom and return to [her] classroom" at 11:14:46. Iliopoulos does not explain why Gardner's report did not provide comparable evidence of the time when Mary left the alcove.

¶35 In support of his claim that there was no comparable evidence available to him, Iliopoulos argues that the time stamps on the existing videos "are simply too unreliable to create a useable timeline between the two videos." We disagree. Although the screen-captured versions of both the East Hall video and the Interior Hall video contain some discrepancies, it would nevertheless have been clear to the jury after viewing the videos that two teachers and a student walked by or near the alcove while the assault was allegedly occurring. The available evidence therefore allowed Iliopoulos to make the argument to the jury that Mary's version of events was not credible because none of the individuals who walked by the alcove during the relevant time frame noticed that anything was amiss.

¶36 Iliopoulos also argues that "requiring the jury to mentally reconcile the two videos does not have the same impact and evidentiary value of actually seeing the teachers in the hallway and then Mary entering the hallway shortly afterwards." In support of this argument, Iliopoulos relies on *State v. Huggett*, 2010 WI App 69, 324 Wis. 2d 786, 783 N.W.2d 675.

¶37 In *Huggett*, the defendant was charged with second-degree intentional homicide after shooting his girlfriend's ex-boyfriend. *Id.*, ¶¶1-3. The State failed to preserve threatening voicemail messages that the victim left on the defendant's and his girlfriend's cell phones shortly before the shooting. *Id.*, ¶¶1-2.

15

On appeal, we rejected the State's argument that comparable evidence was available to the defendant—namely, threatening text messages from the victim and witness testimony regarding the contents of the deleted voicemails. *Id.*, ¶¶21-24. We explained that although the defendant and his girlfriend recalled, generally, that the voicemails were threatening, neither of them "could sufficiently recall the precise language used," and a deputy who had listened to part of one of the voicemails "could only recall that she came away with the perception that the message should be preserved." *Id.*, ¶22. We also reasoned that mere descriptions of the voicemails "could not adequately convey [the victim's] tone," which would have been central to the jury's assessment of whether the defendant subjectively believed that it was necessary to use deadly force against the victim and whether that belief was objectively reasonable under the circumstances. *Id.*, ¶23. Similarly, we concluded that the text messages, "by their very nature, could not convey [the victim's] tone." *Id.*, ¶24.

¶38 *Huggett* is materially distinguishable from the instant case because, here, no evidentiary value was lost when the existing videos, rather than the original East Hall video, were played at trial. The existing videos clearly showed the times when Mary and Iliopoulos entered the alcove, the times when they left the alcove, and the fact that multiple individuals walked by or near the alcove during the alleged assault. As the State observes, "There was never any dispute that several people walked by or near the alcove area during the assault. The jury simply did not find this known evidence persuasive." Under these circumstances, we agree with the State that Iliopoulos's argument that no comparable evidence existed is essentially an attempt "to retroactively manufacture confusion and uncertainty where none existed."

¶39    Because Iliopoulos has not shown either that the original East Hall video was apparently exculpatory or that he lacked comparable evidence, he has not established that the State violated his right to due process by failing to preserve the original East Hall video.  We therefore affirm Iliopoulos's judgment of conviction.[8]

*By the Court.*—Judgment affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[8] Because we conclude that no due process violation occurred, we need not address the State's alternative argument regarding the appropriate remedy for such a violation. *See Turner v. Taylor*, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (explaining that this court need not address all issues raised by the parties if one is dispositive).